Lewis Jubran (SBN 337336)
Abusharar and Associates
501 N. Brookhurst St. #202
Anaheim, CA 92801
Tel: 714-535-5600
Fax: 714-535-5605
Email: associate@abushararlaw.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| Hikma Al Gebori, Saif Al Gburi, Faqar Al Gburi, Haya Abdulkadhim<br><br>          Plaintiffs,<br><br>vs.<br><br>**United States Department of Homeland Security; United States Citizenship and Immigration Services; National Benefits Center; Teri Robinson,** Director of the National Benefits Center; **Kristi Noem,** Secretary, Department of Homeland Security; **Jennifer Higgins,** Acting Director, U.S. Citizenship and Immigration Services,<br><br>          Defendants. | Case No.:<br><br><br>COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS |

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 1

**INTRODUCTION**

1. This action is brought by Plaintiffs Hikma Al Gebori, Saif Al Gburi, Faqar Al Gburi and Haya Abdulkadhim by and through their attorney, to request issuance of a writ of mandamus or in the nature of mandamus and/or to compel under the Administrative Procedure Act ("APA") ordering Defendants and those acting under them to process several I-485 Applications to Register Permanent Residence or Adjust Status, which were received and pending as of February 28, 2023 and which have still not been adjudicated.

2. On February 17, 2022, Immigration Judge Melissa B Karlin of the Phoenix, Arizona Immigration Court granted Plaintiffs' I-589 Application for Asylum and Withholding of Removal. **(Exhibit A- Decision and Order of the Immigration Judge)**.

3. Subsequent to Judge Karlin approving Plaintiffs I-589 Applications, on February 28, 2023, Plaintiffs submitted to Defendant United States Citizenship and Immigration Services an I-485 Application to Register Permanent Residence or Adjust Status for each of them. **(Exhibit B – Receipt Notices)**

4. Since the date that Plaintiffs submitted their I-485 Applications to Register Permanent Residence or Adjust Status, Plaintiffs have not received any notification from Defendant National Benefits Center about when the adjustment of status cases will be adjudicated. According to the USCIS website, the processing time for adjustment of status applications at the is 15.5 months, in this case, it has been nearly 2 years since they submitted their adjustment of status applications. **(Exhibit C– USCIS website print-out)**.

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 2

5. Defendants have violated the Administrative Procedures Act ("APA") by failing to adjudicate the pending I-485 Application to Register Permanent Residence that Plaintiffs filed and which have been pending now for close to two years. Plaintiffs seek to compel Defendants, through a writ of mandamus, to adjudicate the pending adjustment of status cases.

## PARTIES

6. Plaintiff HIKMA AL-GEBORI was granted asylum on February 17, 2022 and she filed her I-485 Application to Register Permanent Residence or Adjust Status on February 28, 2023.

7. Plaintiffs SAIF ABDULKADHIM, FAQAR AL-GBURI and HAYA ABDULKADHIM are the children of Plaintiff Hikma Al-Gebori and they each filed their own I-485 Application to Register Permanent Residence or Adjust Status on February 28, 2023.

8. Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY (hereinafter "DHS") is an agency of the United States government involved in the acts challenged, employs the officers named as defendants, and includes the U.S. Citizenship and Immigration Services and the National Benefits Center, and officers named as defendants in this complaint.

9. Defendant UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES (hereinafter "USCIS") is an agency of the United States government under the DHS, overseeing the National Benefits Center and officers named as defendants in this Complaint.

10. Defendant NATIONAL BENEFITS CENTER (hereinafter "National Benefits Center") is an office within USCIS and the federal agency with direct authority and responsibility to adjudicate Plaintiffs' several I-485 Applications to Register Residence of Adjust Status.

11. Defendant TERI ROBINSON (hereinafter "Director Robinson") is the director of the National Benefits Center office. This suit is brought against Director Robinson in her official capacity, as she is charged with overseeing the adjudication of the I-485 Application to Register Permanent Residence or Adjust Status at the National Benefits Center in a timely manner, and ensuring the efficiency of the officers employed.

12. Defendant KRISTI NOEM (hereinafter Secretary Noem") is the Secretary of the Department of Homeland Security. This suit is brought against Secretary Noem in her official capacity, as she is charged with the administration and enforcement of all immigration and citizenship laws that are bound in the powers, duties, and functions of the Department of Homeland Security.

13. Defendant JENNIFER HIGGINS (hereinafter "Acting Director Higgins") is the Acting Director of USCIS, the Agency charged with adjudicating Plaintiffs' I-485 Applications to Register Permanent Residence or Adjust Status. This suit is brought against Acting Director Higgins in her official capacity, as she is charged with oversight, administration, and execution of immigration laws of the United States.

## JURISDICTION

14. The Administrative Procedure Act recognizes a right of judicial review for any person "suffering legal wrong because of an agency action or aggrieved or adversely affected by such action within the meaning of any relevant statutes." 5 U.S.C. § 702. Plaintiffs suffered a legal wrong and continues to suffer because of the Defendants' failure to act upon the pending I-485

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 4

Application to Register Permanent Residence or Adjust Status applications for indefinite periods of time.

15. This Court has jurisdiction over the present action pursuant to 8 C.F.R. § 204, Immigration & Nationality Act §203 (b)(1)(C); 28 U.S.C. § 1131; 28 U.S.C. §1361, the Mandamus Act; 28 U.S.C. §2201, the Declaratory Judgment Act; and 5 U.S.C. §701-706, the Administrative Procedures Act.  Costs and attorney fees will be sought pursuant to the Equal Access to Justice Act, 5 U.S.C. §504 and 28 U.S.C. §2412(d), et seq. Relief is requested pursuant to said statutes.

16. The APA also provides pursuant to 5 U.S.C. § 706(1) that courts "shall compel agency action unlawfully withheld."  Courts have held that this provision eliminates court discretion to grant relief once an agency has violated a statutory deadline. *See Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1178 (9th Cir. 2002) (noting that when "Congress has specifically provided a deadline for performance, … no balancing of factors is required or permitted."

## VENUE

17.  Venue is proper in this Court, pursuant to 28 U.S.C. §1391(e) which provides that in a civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his or her official capacity, or under the color of legal authority, or any agency of the United States, the action may be brought in any judicial district in which the defendant in the action resides.  Because the defendants are in the District of Columbia, including the United States Department of Homeland Security, and its employees, venue is proper in this Court.

## EXHAUSTION OF REMEDIES

**18.** Plaintiffs have no administrative remedies.  Since Plaintiffs received their Receipt Notices on March 3, 2023 informing that their cases had been received and were in process, they have received no correspondence or communications whatsoever from Defendant USCIS nor Defendant National Benefits Center about how much longer they will have to wait for the pending I-485 Applications to Register Permanent Residence or Adjust Status to be adjudicated. There are no administrative remedies for neglect of duty.

## CAUSE OF ACTION

19. On February 28, 2023, Plaintiffs filed four I-485 Applications to Register Permanent Residence or Adjust Status which were received and processed by the Defendant National Benefits Center.

20.  Since the date that their cases were received by the Defendant National Benefits Center, the Plaintiffs have received no further information about how long they would have to wait to have their applications adjudicated.

21. The USCIS website indicates that it takes 15.5 months to complete adjudication of an I-485 Applications to Register Permanent Residence or Adjust Status and in this case it has been nearly two years since Plaintiffs submitted their applications and there is still no word from Defendants about how much longer the adjudication process will take.

22. Under 28 U.S.C. § 1361, the district courts shall have original jurisdiction of any action in the nature of a mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 6

23. Under the Administrative Procedures Act, a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

24. It has been nearly two years since Plaintiffs submitted their I-485 Applications to Register Permanent Residence or Adjust Status and their cases have not yet been adjudicated by Defendant National Benefits Center.

25. Plaintiff have no adequate remedy at law, and will continue to suffer irreparable harm if the pending I-485 Applications to Register Permanent Residence or Adjust Status are not promptly adjudicated.

27. Pursuant to 28 U.S.C. § 1361, this Court has "original jurisdiction in the nature of the mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the [Plaintiffs.]"

28. Pursuant to 28 U.S.C. § 1651, this Court may issue any and all "writs necessary or appropriate in aid of [the Court's] respective jurisdiction [ ] and agreeable to the usages and principles of law."

### CLAIM FOR RELIEF

29. Plaintiff's claim in this action is clear and certain. Plaintiffs reallege paragraphs 1 through 28, and, as if fully set forth, Plaintiffs are entitled to an order in the nature of mandamus to compel Defendants to complete the adjudication of the pending I-485 Applications to Register Permanent Residence or Adjust Status.   As a result of Defendants' failure to perform their

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 7

duties, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm.

Specifically:

    a.  Plaintiffs have been irreparably damaged from the fear of not knowing what will happen with the pending I-485 Applications to Register Permanent Residence or Adjust Status. Because of the long wait and unknowing, Plaintiffs are enduring significant psychological damage.

    b.  The delay is causing irreparable harm to Plaintiffs who are not able to live their lives in the United States without the assurance that they will receive permanent residence status.

30. The Defendants, in violation of the Administrative Procedures Act, are unlawfully withholding or unreasonably delaying action on Plaintiffs' pending I-485 Applications to Register Permanent Residence or Adjust Status and have failed to carry out the non-discretionary adjudicative functions delegated to them by law with regard to Plaintiffs' case(s).

31. The Defendants, in violation of the Administrative Procedures Act and 22 C.F.R. 42.81(a), are unlawfully withholding or unreasonably delaying action on Plaintiffs' pending applications and have failed to carry out the non-discretionary adjudicative functions delegated to them by law with regard to their cases.

32. The duty of the Defendants is non-discretionary, ministerial, and so plainly described as to be free from doubt that mandamus is appropriate.

33. Plaintiff Hikma Al-Gebouri has attempted to learn about the status of the pending I-485 Applications to Register Permanent Residence or Adjust Status all to no avail. Only the National Benefit Center is able to make decisions on adjudicating the subject I-485 Applications to

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 8

Register Permanent Residence or Adjust Status, leaving no adequate remedy.  Accordingly, Plaintiffs have been forced to pursue the instant action.

## **PRAYER**

34. WHEREFORE, in view of the arguments and authorities noted herein, Plaintiffs respectfully prays that the Defendants be cited to appear herein and that, upon due consideration, the Court:

a.  Accept jurisdiction and maintain continuing jurisdiction of this action;

b.  Declare as unlawful the violation by Defendants of failing to act on properly filed I-485 Applications to Register Permanent Residence or Adjust Status;

c.  Declare Defendants' failure to carry out the adjudicative functions delegated to them by law with regard to Plaintiffs' case as agency action unlawfully withheld and unreasonably delayed, pursuant to 5 U.S.C. § 706(1);

d.  Issue a writ in the nature of mandamus pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), compelling Defendants to take action on Plaintiffs I-485 Applications to Register Permanent Residence or Adjust Status and timely adjudicate their cases;

e.  Grant attorney's fees and costs of this suit under the Equal Access to Justice Act, 28 U.S.C. § 2412;

f.  Grant such other relief at law and in equity as justice may require.

Dated this February 13, 2025                      Respectfully Submitted,

/s/ Lewis Jubran

Lewis Jubran, Esq.
Counsel for Plaintiffs

COMPLAINT FOR DECLARATORY RELIEF AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS - 9

**LIST OF EXHIBITS TO COMPLAINT FOR DECLARATORY AND FOR A WRIT IN THE NATURE OF IMMIGRATION MANDAMUS**

**AL-GEBORI v. UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.**

| Exhibit | Description | Page |
|---|---|---|
| A | Decision and Order of the Immigration Judge | 1-18 |
| B | I-797C Notice of Actions (x4) | 19-22 |
| C | Print out from USCIS website | 23 |

# EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
250 NORTH 7TH AVENUE, SUITE 300
PHOENIX, ARIZONA 85007

| | |
|---|---|
| IN THE MATTER OF | )   IN REMOVAL PROCEEDINGS |
| | ) |
| AL-GEBORI, Hikma Abbas Hadi, | )   FILE NOS.     A208-465-412 |
| AL-GBURI, Saif Ali Abdulkadhim, | )                 A208-465-413 |
| AL-GBURI, Faqar Ali Abdulkadhim, | )                 A208-465-414 |
| ABDULKADHIM, Haya Ali Abdulkadhim, | )                 A208-465-415 |
| | ) |
| Respondents. | )   DATE:         February 17, 2022 |
| | ) |

**CHARGES:**       Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA" or "the Act"), in that after admission as nonimmigrants under section 101(a)(15) of the Act, the respondents remained in the United States for a time longer than permitted in violation of the Act or any other law of the United States

**APPLICATIONS:**   Asylum under section 208 of the Act
Withholding of removal under section 241(b)(3) of the Act
Withholding or deferral of removal pursuant to Article 3 of the Convention Against Torture, 8 C.F.R. § 1208.16(c)

## APPEARANCES

**On Behalf of the Respondents:**
Akram Abusharar, Esq.
Abusharar & Associates
501 North Brookhurst Street
Suite 202
Anaheim, California 92801

**On Behalf of the Department:**
Peter Mather, Esq.
Assistant Chief Counsel
U.S. Department of Homeland Security
2035 N. Central Avenue
Phoenix, Arizona 85004

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I.    PROCEDURAL HISTORY

On October 15, 2020, the Department of Homeland Security ("Department") served a Notice to Appear ("NTAs") upon the lead respondent, Hikma Abbas Hadi AL-GEBORI (hereinafter "lead respondent" or "respondent Hikma"), and her children, rider respondents Saif Ali Abdulkadhim AL-GBURI ("respondent Saif"), Faqar Ali Abdulkadhim AL-GBURI

AL-GEBORI, et al.
A208-465-412

("respondent Faqar") and Haya Ali Abdulkadhim ABDULKADHIM ("respondent Haya"), charging all of them as removable pursuant to Section 237(a)(1)(B) of the INA, in that after admission as nonimmigrants under Section 101(a)(15) of the Act, they remained in the United States for a time longer than permitted. In support of the respective charges, the Department alleged that the four respondents: (1) are not citizens or nationals of the United States; (2) are natives and a citizens of Iraq; (3) were admitted to the United States at Los Angeles, California, on or about August 21, 2015, as nonimmigrant B2 Visitors with authorization to remain in the United States for a temporary period not to exceed February 20, 2016; and (4) remained in the United States beyond February 20, 2016, without authorization from the Immigration and Naturalization Service or its successor the Department. Exs. 1A, 1B, 1C, 1D.

The Department filed the NTAs with the Phoenix Immigration Court on October 19, 2020, thereby initiating removal proceedings against all four respondents.

On October 16, 2020, the Court received a referral of the lead respondent's completed Form I-589, Application for Asylum and for Withholding of Removal ("I-589 application") from United States Citizen and Immigration Services ("USCIS").Ex. 2A. That application was filed originally with USCIS on September 10, 2015. Respondent Saif (A208-465-413) is a derivative of the lead respondent's asylum claim and has no independent applications for withholding of removal or protection under the CAT.

Similarly, respondent Faqar's (A208-465-414) and respondent Haya's (A208-465-415), respective I-589 applications, were also filed with USCIS on September 10, 2015, and referred to the Immigration Court on October 16, 2020. Exs. 2B and 2C.

On May 10, 2021, through written pleadings, the lead respondent admitted all factual allegations contained in her NTA, conceded removability, and declined to designate a country of removal. Ex. 8A. Based on the lead respondent's admissions and concession, the Court sustained the charge of removability in her NTA and directed Iraq as the country of removal should her removal become necessary. The lead respondent indicated her intent to apply for relief from removal in the forms of asylum and withholding of removal under the INA, as well as protection under Article III of the United Nations Convention Against Torture ("CAT"). *Id.*

At a continued removal hearing on October 6, 2021, the lead respondent's three children, (the other three respondents) similarly admitted all factual allegations contained in their respective NTAs, conceded removability, and declined to designate a country of removal. Based on these respondents' admissions and concessions, the Court sustained their respective charges of removability and directed Iraq as the country of removal should their removal become necessary. All three respondents indicated their intent to apply for relief from removal in the forms of asylum and withholding of removal under the INA, as well as protection under CAT.

A hearing on the merits was conducted on December 9, 2021. The lead respondent and respondent Faqar testified in support of all respondents' applications. The four Respondents' cases are consolidated as they rely on the same core facts. Therefore, this analysis and decision apply to all four respondents, regardless of specific mention.

AL-GEBORI, et al.
A208-465-412

For the reasons set forth below, the Court will **GRANT** all four respondents' requests for asylum relief and protection from removal.

## II.    EVIDENCE

### A.  Summary of Lead Respondent's Testimony[1] and Declaration

The lead respondent testified that she last entered the United States in August 2015, on a visitor B-2 visa. Respondent Hikma and her family intended to and actually went to Disneyland after receiving their visas. She has not left the United States since.

Prior to coming to the United States, the lead respondent and her family lived in Guangzhou, China for approximately ten years. She testified that her husband owns a shipping company there. During that time they traveled four times to their native country of Iraq to renew their travel visas. Respondent Hikma testified that her son, respondent Faqar, travelled once to Iraq by himself in 2015, to secure documentation required to attend a University in China. During these brief visits, the family stayed with a family friend at an unknown address. Additionally, the lead respondent testified that the family did not let anyone know of their presence in the country and did not leave the house unless necessary.

Respondent Hikma testified that she fears returning to Iraq. She was born to Shi'a Muslim parents of Iraqi Nationality. She is married to a man who is Sunni. She claims her "mixed marriage" caused her family to be threatened and harmed by both Shi'a and Sunni extremists. Ex. 12A, Tab A2, page 1. She described several incidents of harm that occurred amongst family members in Iraq and threats she personally received from members of a Shiite armed militia group that controlled her neighborhood. As it relates to the harm against her family— first, her son Hussein, was kidnapped and killed. Second, her brother Muhammad was killed. Third, her brother, Amir's house was bombed, resulting in the amputation of her nephew's right hand. And lastly, her son Faqar was kidnapped and repeatedly assaulted in 2015.

More specifically, in 2005, Respondent Hikma and her family lived in a predominantly Shi'a neighborhood. *Id.* Her neighbors had begun to harass the family because of her husband's Sunni denomination and beliefs. *Id.* In March 2005, Respondent Hikma received a threatening letter ordering her and her family to leave the neighborhood within seventy-two hours or face death. *Id.* The letter explained that this "was being done to rid the area of dirty infidel Sunnis." *Id.* It was signed by the Office of the Martyr Sadr, the political wing of the Mahdi Army, a radical Shi'a militia that controlled the neighborhood they lived in. *Id.*

After receiving the letter, her husband went to the militia group's local office. *Id.* at 2. He asked for more time, as seventy-two hours was insufficient time for the family to pack and relocate. *Id.* Respondent Hikma's husband was kicked out of the office and cursed at. *Id.* He was also

---

[1] Both the Lead Respondent and respondent Faqar waived presentation of evidence via direct examination and instead elected to rest on their affidavits and evidence previously submitted into the record. Testimony taken on December 9, 2021, was through cross-examination by the Department and re-direct by Respondents' counsel. The testimony was conducted with the assistance of an Arabic interpreter.

3

AL-GEBORI, et al.
A208-465-412

called names and received disparaging comments about his Sunni religious beliefs. *Id.* He was told the seventy-two hours they had given the family was a courtesy extended because of the lead respondent's was Shi'a. *Id.* The family attempted to move in time, but were unable to relocate with the seventy-two hours.

A few days later, on March 18, 2005, their oldest son Hussein was kidnapped on his way to school. *Id.* Two days after his kidnapping, respondent Hikma's husband received a phone call. The kidnappers demanded $10,000 USD for Hussein's release. *Id.* Her husband collected and delivered the money later the same day. *Id.* The kidnappers told her husband they would release Hussein shortly. *Id.* Several hours later, they received another phone call instructing them to go to Al Yarmouk Hospital to retrieve Hussein. *Id.* They went to the hospital and discovered their son Hussein had been killed. *Id.* He had been shot three times. *Id.*

Respondent Hikma testified that they did not know who the perpetrators were at first. However, after their son's murder they were able to piece together evidence and witnesses that led them to conclude it was members of the same Shiite armed militia group that sent the letter days prior. *Id.* They filed a police report accusing the Mahdi Army of the murder. *Id.* They provided the information they had that led them to that belief. *Id.* No one was arrested or charged with the murder of their son. *Id.*

On April 3, 2005, the family moved to a new house in a new area, this one a Sunni neighborhood. *Id.* The same day the family moved in, armed Al-Qaeda militants came to the house to ask for the lead respondent and her husband's identification. *Id.* The militants determined that the lead respondent was Shi'a and told her husband the family would have to leave this neighborhood within one week unless he divorced her and she moved away. *Id.*

Thereafter the family went into hiding. They stayed for five days before fleeing to Jordan. *Id.* After staying in Jordan for one week, the family left to China. In China the family received temporary, business based residence permits. *Id.* The respondent testified that they were not given any other status during their time in China. The visas they received were based upon her husband's business in China.

Respondent Hikma testified that her brother, Mohammed, was killed in 2013. She explained that her brother was living in Karbala and was employed as a soccer coach. *Id.* at 2-3. She described him in her declaration as "an outspoken critic of all things wrong in Iraq, especially the corrupt political system preventing the country from moving forward and achieving its potential." *Id.* at 3. He expressed these views on social media and received threats warning him to leave the country and return to Holland, where he had previously lived. *Id.* In response, Mohammed filed a police report. *Id.* The authorities took notice of the criticism and threats. Mohammed was ultimately invited to meet with the deputy governor of Karbala, a relative of then Prime Minister Al-Maliki. *Id.* The deputy governor ordered Mohammed to leave the country. *Id.* He did not.

Five days after this meeting, Mohammed was beaten by SWAT soldiers following a football game. *Id.* The assault resulted in multiple skull fractures that ultimately led to his death. The lead respondent believes her brother was killed for criticizing the government. *Id.*

**4**

AL-GEBORI, et al.
A208-465-412

After the death of her brother Mohammed, her other brother Amir, brought a civil suit claim against the policemen involved in the assault. *Id.* While the lawsuit was pending, an unknown assailant tossed a live grenade onto Amir's property. *Id.* The explosion caused severe wounds to Amir's son resulting in the amputation of his right hand. *Id.*

Ultimately, Amir's civil case resulted in an in-absentia ruling of death for five SWAT members, two life sentences and terms of imprisonment for the remaining three attackers who killed his brother Mohammed. *Id.* However, the men had gone into hiding prior to the sentences and remain at large to this day. *Id.*

In addition, the lead respondent testified that in 2015, her son respondent Faqar, went to Iraq by himself to secure required immigration clearance letters to attend the University in China. While there, he was kidnapped along with his uncle, respondent Hikma's brother, Firas. Her son and brother were held hostage and beaten over several days. The lead respondent claims that the men assaulting her son and brother demanded that the family dismiss their claim against SWAT. They refused and were ultimately released. Respondent Faqar was told his release was to send a message to the family.

Respondent Hikma in her declaration also stated that her brother Amir was contacted by Iraqi government officials who threatened to kill Respondent Faqar and her brother Firas unless Amir dismissed his claim against SWAT forces. Amir has since fled Iraq and now lives with his family in Lithuania.

Repondent Hikma testified that all the incidents of harm described have resulted in a fear, for herself and her family, of returning to Iraq. She stated that the individuals responsible for causing harm are free and are protected by the Iraqi government, or a part of it. She claims that the authorities are on the side of the criminals who killed her family members and have demonstrated of pattern of pressuring them to dismiss their claims against those responsible. For all of the reasons, she fears that if her and her family return to Iraq, they too will be harmed.

**B. Summary of Respondent Faqar's Testimony and Declaration**

Respondent Faqar was born in 1996. He last entered the United States on August 21, 2015, and has not left since. In his declaration he claims fear if returned to Iraq of being kidnapped, tortured or killed by Muslim extremists (both Shi'a and Sunni) on account of his Sunni identity, his parents' mixed religious marriage (his father is Sunni and his mother is Shi'a) and his anti-Iraqi government social media posts. Ex. 5B, Tab B2, pg. 1. He is vocal about his opposition to the government in Iraq through social media platforms. He openly criticizes the government about the experiences he and his family suffered during their time in Iraq.

He further claims that as a male Sunni Muslim he would be systematically targeted by Shi'a Muslims. *Id.* His identity as such is readily identifiable given his observance of customs particular to the Sunni denomination and the combination of his surname and his father's birthplace. *Id.*

AL-GEBORI, et al.
A208-465-412

Respondent Faqar detailed the harm his family has suffered based upon their religion in his affidavit. *Id.* He also answered questions regarding this harm. Such information was consistent with that provided by his mother, respondent Hikma, and detailed in her testimony section. As such, the Court will not restate the same evidence and facts at this time, but will rather incorporate his affidavit and his mother's testimony by reference.

However, respondent's Faqar's description of his detention by Iraqi authorities provided more details than his mother's testimony. As such, a description of his testimony is provided. Respondent Faqar testified that he returned to Iraq when he was eighteen-years-old on February 21, 2015. He purpose was to obtain a background check that was required to attend the University in Guangzhou, China. While in Iraq, he was kidnapped at a government checkpoint on his way into the city of Karbala. He had been traveling with his uncle, Firas, in Baghdad and intended to visit Karbala to visit other family members. While driving to Karbala, respondent Faqar and his uncle passed approximately two checkpoints and were waived through without issue. However, at the last checkpoint before arriving to Karbala, individuals wearing Iraqi military uniforms asked the vehicle he was in to pull over to permit them to check their identification cards. Respondent Faqar stated that the men recognized his uncle's name and the two were quickly handcuffed, blindfolded, and taken to another vehicle. He testified that they were in the vehicle driving for approximately thirty minutes when they were eventually taken out of the vehicle.

Respondent Faqar was punched, slapped, and detained for seven days. During that time, he was provided minimal food and water. He was hung, punched, and threatened every day. He stated that the officers threatened that his family needed to drop the lawsuit pending against them. On the seventh day, respondent Faqar was released but his uncle remained in detention. Respondent Faqar was again blindfolded and put into a vehicle. He testified that he was pushed out of the vehicle and realized he was outside of his uncle's house. He was again threatened that if the family did not drop the lawsuit, they would be destroyed. Respondent Faqar was warned that he was a message to the family.

Respondent Faqar testified that he was scared and shocked upon his arrival to his uncle's home. He initially refused medical treatment but was later treated at a hospital in Karbala. He had injuries to his face including a broken nose and injured ribs. Respondent Faqar stated that he refused to get surgery at that time and wanted to quickly depart to Baghdad so he could leave the country. He was not stopped at any checkpoint from Karbala to Baghdad. Respondent Faqar thereafter received the necessary documents required for the University in Guangzhou and left Iraq and returned to China in the beginning of March 2015.

Respondent Faqar testified that he has received threats since 2015. He stated that he is very active on social media and openly criticizes the Iraqi government on the various platforms by commenting on posts or posts of his own and he receives threats in response. He stated that he knows individuals who have posted similar anti-government comments on social media, returned to Iraq, and have since disappeared. He stated that the Iraqi government does not allow individuals to express their political opinion on any media or form of social media.

## C. Documentary Evidence

The following documents were admitted, without objection, as evidence:

6

AL-GEBORI, et al.
A208-465-412

Lead Respondent (Hikma Abbas Hadi Al-Gebori) A208-465-412

| Exhibit | Document |
|---|---|
| 1A | Notice to Appear, filed October 16, 2020 |
| 2A | Form I-589, Application for Asylum and Withholding of Removal, originally submitted to Citizenship and Immigration Services ("CIS") on September 10, 2015, filed with the Immigration Court on October 16, 2020 |
| 3A | Priority Mail Receipt and Supplemental Documents in Support of I-589 Application |
| 4A | Supplemental Filing for Existing Asylum Application |
| 5A | Scheduling Order, dated December 22, 2020 |
| 6A | Decision of Scheduling Order, dated February 26, 2021 |
| 7A | Interim Order of the Immigration Court, dated May 4, 2021 |
| 8A | Respondent's Written Pleadings, filed May 10, 2021 |
| 9A | The Department's Submission of Evidence, Tabs A-D, filed May 12, 2021 |
| 10A | The Department's Second Submission of Evidence, Tabs A-B, filed May 26, 2021 |
| 11A | Decision on Removability, dated July 7, 2021 |
| 12A | Respondent's Documents In Support of I-589 Application, Tabs A1-A31 |
| 13A | Respondent's Brief in Support of I-589 Application, filed September 7, 2021 |
| 14A | Respondent's Second Set of Documents in Support of I-589 Application, Tabs A32-A37, filed September 13, 2021 |

Rider One (Saif Ali Abdulkadhim Al-Gburi) A208-465-413

| Exhibit | Document |
|---|---|
| 1D | Notice to Appear, filed October 16, 2020 |
| 2D | Scheduling Order, dated December 22, 2020 |

Rider Two (Faqar Ali Abdulkadhim Al-Gburi) A208-465-414

| Exhibit | Document |
|---|---|
| 1B | Notice to Appear, filed October 19, 2020 |
| 2B | Respondent's Form I-589, Application for Asylum and Withholding of Removal, originally submitted to Citizenship and Immigration Services ("CIS") on September 10, 2015, filed with the Immigration Court on October 19, 2020 |
| 3B | Respondent's Supporting Documents and declaration (beginning at page 9) |
| 4B | Scheduling Order, dated December 22, 2020 |
| 5B | Respondent's Supporting Documents in Support of I-589, Asylum, Withholding of Removal, and Protection Under the Convention Against Torture, Tabs B1-B17, filed September 7, 2021 |
| 6B | Respondent's Brief filed November 12, 2021 |

Rider Three (Haya Ali Abdulkadhim Abdulkadhim) A208-465-415

| Exhibit | Document |
|---|---|
| | |

AL-GEBORI, et al.
A208-465-412

| 1C | Notice to Appear, filed October 19, 2020 |
|----|------|
| 2C | Respondent's I-589, Application for Asylum and Withholding of Removal, originally submitted to Citizenship and Immigration Services ("CIS") on September 10, 2015, filed with the Immigration Court on October 19, 2020 |
| 3C | Supplemental Filing for Original Asylum Application, filed with the Asylum Office on September 8, 2020 |
| 4C | Declaration of Haya Ali Abdulkadhim (beginning at page 8) |
| 5C | Scheduling Order, dated December 22, 2020 |
| 6C | Respondent's Documents in Support of Asylum, Withholding of Removal, and Protection Under the Convention Against Torture, Tabs C1-C16, filed September 7, 2021 |

The Court has reviewed and familiarized itself with the record of proceedings in accordance with the regulations. *See* 8 C.F.R. § 1240.1(b). Additionally, the Court has considered all of the evidence and testimony in the record, even if not specifically discussed in this decision.

## III.    CREDIBILITY

Before determining whether an applicant meets his or her burden of establishing eligibility for the forms of relief requested, the Court must make a threshold determination regarding the non-citizen's credibility. INA § 208(b)(1)(B)(iii); INA § 241(b)(3) (incorporating the credibility standard under INA § 208(b)(1)(B) for purposes of the withholding of removal credibility analysis). If an applicant filed an application for asylum after May 11, 2005, the claim is governed by the REAL ID Act provisions regarding credibility. REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231.

The REAL ID Act provides, in pertinent part, as follows:

Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

INA § 208(b)(1)(B)(iii).

The respondents filed their original asylum applications in 2020; their applications are therefore governed under the REAL ID Act. INA § 208(b)(1)(B)(iii).

AL-GEBORI, et al.
A208-465-412

The Court finds that overall, the respondents' testimony was consistent internally, with the documentation in the record and each other. Overall, both of these respondents were responsive to questions, directly and clearly answered every question posed, and responded to inquiries with adequate detail. The Court will, accordingly, find their testimony credible for purposes of this analysis.

## IV.    ASYLUM

In asylum adjudications, the applicant bears the burden of establishing statutory eligibility, which requires a showing of past persecution or a well-founded fear of future persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. INA § 101(a)(42)(A). If eligibility is established, asylum may be granted through the exercise of discretion. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). For applications filed after the enactment of the REAL ID Act, the applicant must establish that the enumerated ground was or will be at least one central reason for persecuting the applicant. INA § 208(b)(1)(B)(i).

### A.    One-Year Filing Deadline

An asylum applicant has the burden of proving by clear and convincing evidence that his or her application has been filed within one year of the date of the non-citizen's last arrival in the United States. INA § 208(a)(2)(B); 8 C.F.R. § 1208.4(a)(2)(i). The application of this filing deadline is not discretionary; rather, it is an absolute requirement of the statute. *Ramadan v. Gonzales*, 479 F.3d 646, 656 n.11 (9th Cir. 2007). The term "last arrival" includes "a [non-citizen]'s most recent coming or crossing into the United States after having traveled from somewhere outside of the country." *Matter of F-P-R-*, 24 I&N Dec. 681, 683 (BIA 2008).

All four respondents in the present case first entered the United States on August 21, 2015. The three adults filed their original Asylum Applications with USCIS on September 10, 2015. *See* Ex. 2A, 2B and 2C. They have therefore satisfied the one-year filing requirement for asylum.

### B.    Past Persecution

To establish "eligibility for asylum based on past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir. 2000); *see also Gu v. Gonzales*, 454 F.3d 1014, 1019 (9th Cir. 2006); *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000); *see also* 8 C.F.R. § 1208.13(b)(1).

### 1.    Harm Rising to the Level of Persecution

The term "persecution" is not defined by the Act. The Board of Immigration Appeals ("BIA" or "the Board") has defined "persecution" as "either a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985). The Ninth Circuit characterizes persecution as "an extreme concept, marked by the infliction of suffering or harm . . . in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc). The Court "look[s] at the totality of

9

AL-GEBORI, et al.
A208-465-412

the circumstances in deciding whether a finding of persecution is compelled." *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004); *see also Guo v. Sessions*, 897 F.3d 1208, 1217 (9th Cir. 2018) (stating that when they "consider the record as a whole, [they] are compelled to conclude that Petitioner suffered past religious persecution"). In order to determine if a respondent has suffered persecution, the Court may consider seven non-exhaustive factors: 1) physical violence and resulting serious injuries; 2) the frequency of harm; 3) if there are specific threats combined with confrontation; 4) the length and quality of detention; 5) harm to family and close friends; 6) economic deprivation; and 7) general societal turmoil. *Sharma v. Garland*, 9 F.4th 1052, 1061 (9th Cir. 2021).

The Ninth Circuit has held that various forms of physical violence, including assault and beatings, amount to persecution. *See Chand v. INS*, 222 F.3d 1066, 1073–74 (9th Cir. 2000) (stating that physical harm has consistently been treated as persecution); *see also Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009) (same); *Ahmed v. Keisler*, 504 F.3d 1183, 1194 (9th Cir. 2007) (same). Persecution may be emotional or psychological, as well as physical. *See Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004). Threats of serious harm, for instance, particularly when combined with confrontation or other mistreatment, may constitute persecution. *See, e.g., Mashiri v. Ashcroft*, 383 F.3d 1112, 1120–21 (9th Cir. 2004).

In the present case, the respondents have suffered multiple instances of harm in Iraq. The harm began in 2005. At that time the family was living in a predominantly Shiite neighborhood. Neighbors had been harassing the family because the lead respondent's husband (and children) were Sunni. In March of that year, the harassment culminated in a letter addressed to the lead respondent. The letter gave the family seventy-two hours to leave the neighborhood or else they would face death. *See* Ex. 12A, Tab A2. The letter explicitly stated, this was being done to "rid the area of dirty infidel Sunnis." *Id.* It was signed by the Office of the Martyr Sadr, the political wing of the Mahdi Army, a radical Shi'a militia group. *Id.*

The lead respondent's husband went to the militia's local office to plead for more time for the family to relocate from the area. The officials refused to give him an extension of time and kicked him out of their office. The men cursed at him and made disparaging remarks about his Sunni religious affiliation. The militia officials told him the 72 hours was a courtesy extended because his wife, the lead respondent, was Shi'a. *Id.* The family tried their best to relocate in the time given, but were unable to do so.

On March 18, 2005, their oldest son, Hussein was kidnapped on his way to school. *Id.* Two days later, the kidnappers contacted the lead respondent's husband and demanded $10,000 USD for Hussein, their son's release. The family delivered the money later the same day. The kidnappers indicated they would release Hussein shortly. But they did not. The kidnappers instead called the family hours later and told them to pick up Hussein at the Al Yarmouk Hospital. *Id.* Hussein had been killed. He had been shot three times. *Id.*

Neighbors who witnessed the kidnapping spoke with the family and identified the Mahdi Army as the ones responsible for the criminal act. *Id.* The same group who had drafted the letter.

AL-GEBORI, et al.
A208-465-412

Subsequently in 2013, respondent Hikma's brother, Muhammed was killed. She described Mohammed as "an outspoken critic of all things wrong in Iraq, especially the corrupt political system preventing the country from moving forward and achieving its potential." *Id.* at 3. He expressed these views on social media and received threats warning him to leave the country and return to Holland, where he had previously lived. *Id.* Mohammed filed a police report detailing this threats. *Id.*

Mohammed was ultimately invited to meet with the deputy governor of Karbala, a relative of then Prime Minister Al-Maliki. *Id.* The deputy governor ordered Mohammed to leave the country. *Id.* He did not.

Five days after this meeting, Mohammed was beaten by SWAT soldiers following a football game. *Id.* The assault resulted in multiple skull fractures that ultimately led to his death.

After the death of her brother Mohammed, the lead respondent's brother Amir, brought a civil suit claim[2] against the policemen involved in the assault. *Id.* While the lawsuit was pending, an unknown assailant tossed a live grenade into Amir's house/backyard. *Id.* The explosion caused severe wounds to Amir's son resulting in the amputation of his right hand. *Id.*

In 2015 respondent Faqar went to Iraq by himself. While there, he was kidnapped along with his uncle. He and his uncle were held hostage and beaten over several days. The men assaulting them repeatedly demanded that the family dismiss their claim against SWAT and their role in Mohammed's death. They were both ultimately released, but respondent Faqar was told that if his family did not drop the lawsuit, they would be "destroyed." He testified that he was released to be the "message to the family."

The Court finds that these incidents in Iraq, cumulatively, rise to the level of harm required for a finding of past persecution. Relevant to the analysis here is the recognition that the respondents suffered not an isolated incident, but "an ongoing pattern of serious maltreatment" that lasted ten years, from 2005 with the threats and murder of Hussein until respondent Faqar's visit to Iraq in 2015. *Gu v. Gonzales*, 454 F.3d 1014, 1020 (9th Cir. 2006). The family suffered serious threats and various forms of physical violence, including assaults requiring medical attention, kidnappings, detainment, and even death. *See* Ex. 12A, Tab A4 (Hospital report pertaining to injuries suffered by respondent Faqar during his 2015 kidnapping); Ex. 12A, Tab A15 (Mohammed's death certificate). Additionally, a threat was carried out by use of a live grenade that was thrown onto the property of a relative resulting in the amputation of another family member's right hand. *See* Ex. 12A, Tab A5 (Medical report from Karbala Health Department pertaining to injuries suffered by Amir and his son).

Therefore, the Court finds that Respondents have sufficiently demonstrated past persecution given the threats of violence and the fact that violent acts were actually carried out. The Court next considers whether the persecution the respondents suffered in Iraq occurred on account of a protected ground.

---

[2] The Court is aware that such proceedings are usually criminal in nature and brought by the government. However, it was repeatedly described as a civil action taken by the victim's brother on behalf of the family, and thus described here as such.

AL-GEBORI, et al.
A208-465-412

## 2. On Account of a Protected Ground

For asylum claims filed on or after May 11, 2005, the REAL ID Act requires that an applicant establish that a protected ground of race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant. 8 U.S.C. § 1158(b)(I)(B)(i). The respondents in the present case have sought relief on the basis of their religion, political opinion, as well as their membership in a particular social group of "Iraqis who have had family members murdered by the government or forces the government is unable or unwilling to control," as specified at their individual hearing and in their brief. Ex. 6B at 13.

The persecutor's motivation may be established by direct or circumstantial evidence. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Where direct evidence may take the form of a straightforward statement, circumstantial evidence may include more subtle aspects, such as the timing of the persecution and signs left at the site of persecution. *See Deloso v. Ashcroft*, 393 F.3d 858, 865-66 (9th Cir. 2005). However, indirect statements made by the persecutor may also constitute circumstantial evidence of motive. *See Gafoor v. INS*, 231 F.3d 645, 651-52 (9th Cir. 2000).

Based upon the evidence before it, the Court finds the respondents have met their burden in establishing the harm they suffered or fear will befall them was on account of a protected ground. Specifically in this case, there is sufficient evidence the one central reason they were persecuted was account of their religion and/or political opinion(s).

### a. Religion

Respondent Hikma was born to Shi'a Muslim parents of Iraqi Nationality. She is married to a man who is Sunni. Her children (the three other respondents) are also Sunni. They have established that the family's differing religious beliefs and affiliations have caused the family to be threatened and harmed by both Shi'a and Sunni extremists. As previously detailed, in 2005, the family lived in a predominantly Shi'a neighborhood. Their neighbors harassed the family because of respondent Hikma's husband and childrens' Sunni denomination and beliefs. In March 2005, Respondent Hikma received a threatening letter ordering her and her family to leave the neighborhood within seventy-two hours or face death. The letter explicitly stated that this "was being done to rid the area of dirty infidel Sunnis." When the family could not relocate within the time frame the oldest son Hussein was kidnapped and murdered.

On April 3, 2005, the family moved to a new house in a new area, this one a Sunni neighborhood. The same day the family moved in, armed Al-Qaeda militants came to the house to ask for the lead respondent and her husband's identification. The militants determined that the lead respondent was Shi'a and told her husband the family would have to leave this neighborhood within one week unless he divorced her and she moved away.

Based upon the evidence presented, the respondents have established that one central reason for the harm they suffered, as detailed above, was due to their religious beliefs. The

12

AL-GEBORI, et al.
A208-465-412

respondents credibly testified that a Shiite Militia group demanded that they relocate from a predominantly Shi'a neighborhood. They explicitly stated the demand was made in an effort to "rid the area of dirty infidel Sunnis." *See* Ex. 12A, Tab A2.

When the family was unable to relocate within the timeframe given, their son was kidnapped and murdered. Eyewitnesses to the kidnapping informed the family that the Shiite Militia were the ones responsible.

The family was able to eventually relocate. However, this time they moved to a Sunni neighborhood and experienced additional threats due to lead respondent's religious affiliation. Fearing additional harm, as they had experienced before, the family went into hiding and fled the country.

The Court finds that one central reason for the harm the respondents suffered was on account of a protected ground, specifically here religion. Even had it not, the Court finds the respondents have also met their burden to establish past persecution on account of their political opinion(s).

### b. Political Opinion

Persecution based on a political opinion requires an applicant to "show proof of a nexus between his [or her] political opinion and the persecution. . . . 'through some evidence, either direct or circumstantial, that the persecutors know of his [or her] . . . political opinion and [have] or will likely persecute him [or her] *because* of it.'" *Matter of N-M-*, 25 I&N Dec. at 526. "A political opinion encompasses more than just participation in electoral politics or holding a formal political ideology." *Zhiqiang Hu v. Holder*, 652 F.3d 1011, 1017 (9th Cir. 2011). An applicant's political opinion may be one the applicant actually holds or one that is imputed to him or her. *Id.*; *see also T-M-B-*, 21 I&N Dec. at 777; *Matter of S-P-*, 21 I&N Dec. at 489-90. To determine "the motivation for threats or harm in an actual or imputed political opinion asylum claim," an Immigration Judge must examine the record "for direct or circumstantial evidence from which it would be reasonable to conclude that those who threatened or harmed the respondent were in part motivated by an assumption that [his or her] political views were antithetical to their cause." *T-M-B-*, 21 I&N Dec. at 778. At the same time, persecution on account of political opinion must be due to the victim's political opinion, not that of his or her persecutors. *See INS v. Elias-Zacarias*, 502 U.S. 478 at 482.

In the present case, the Court finds that the respondents held an actual or imputed political opinion of which the persons who harmed them were aware. To begin with, Mohammed, the lead respondent's brother (and the other respondent's uncle) was described as "an outspoken critic of all things wrong in Iraq, especially the corrupt political system preventing the country from moving forward and achieving its potential." Ex. 12A, Tab A2, page 3. He expressed these views on social media. He received threats warning him to leave the country and return to Holland, where he had previously lived. In response, Mohammed filed a police report. *Id.* The authorities took notice of the criticism and threats. Mohammed was ultimately invited to meet with the deputy governor of Karbala, a relative of then Prime Minister Al-Maliki. *Id.* The deputy governor ordered Mohammed to leave the country. *Id.* He did not.

13

AL-GEBORI, et al.
A208-465-412

Five days after this meeting, Mohammed was beaten by SWAT soldiers following a football game. *Id.* The assault resulted in multiple skull fractures that ultimately led to his death.

A lawsuit was brought by Amir (lead respondent's brother) against the policemen involved in the murder of Mohammed. This lawsuit informed the entire community of their family's opposition to the government, views about who was responsible for Mohammed's death and the possible motives for his murder.

These ardent criticisms led to reprisals in the form of repeated threats, a bombing at a family member's home, and the kidnapping, detention and beating of respondent Faqar and his uncle. Thus, considering the ways in which Respondents opposed the government, and the actions and statements by their assailants, the Court finds the Respondents held an actual or imputed political opinion of which their persecutors were aware.

The Court now considers whether a nexus exists between the Respondents' political opinion and the harm they suffered. It is well-established that an applicant does not need to provide direct evidence that a protected ground was one central reason the persecutors targeted him or her. Rather, circumstantial evidence and reasonable inferences based on the record may be sufficient. *See Elias-Zacarias*, 502 U.S. at 483; *see also T-M-B-*, 21 I&N Dec. at 778. In light of these binding decisions, the Court finds sufficient evidence in the record to demonstrate that one central reason for the harm the Respondents suffered was their political opinion.

The context of their interactions with police officers and other government-sponsored agents provides insight into the motives behind the harm they experienced. For instance, respondent Hikma's brother, Mohammed, was publicly assaulted by several policemen several days after a meeting with the deputy governor where he was told to leave the country and refused to do so. The Court recognizes that Mohammed is not a respondent in the case but a family member. However, his expression of his political opinions and their result are significant in this analysis as his murder led to the lawsuit filed by respondent Hikma's brother, Amir. That lawsuit was filed on behalf of Mohammed's family and detailed their opposition to the government, their belief that government officials were responsible for the death of Mohammed and the possible motives they had for killing him. This lawsuit then in turn led to the kidnapping and detention of respondent Faqar and his uncle by agents of the government.

Respondent Faqar credibly testified that during his seven day detention and daily beatings he was threatened that the family needed to drop the lawsuit.

Based on the direct and circumstantial evidence, the Court reasonably concludes that the motive behind respondent Faqar's kidnapping and detention was directly related to the pending lawsuit and in part motivated by an assumption that the Respondents political views were antithetical to their cause. *T-M-B-*, 21 I&N Dec. at 778.

As such, taking into consideration the facts and circumstances surrounding the incidents of harm as previously described, the Court finds that the Iraq government or its sponsored agents targeted the Respondents for their political opposition and opinions.

14

AL-GEBORI, et al.
A208-465-412

Therefore, based upon the evidence of record and for the reasons stated above, the Court finds that the Respondents have met their burden of establishing that their political opinion—specifically, the family's public opposition to the government—was at least one central reason for the harm they suffered in Iraq. INA § 208(b)(1)(B)(i); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992).

### c. Membership in Particular Social Group

When claiming membership in a particular social group, an asylum applicant must prove that the alleged group is cognizable and that he is, in fact, a member of that group. *Matter of W-G-R-*, 26 I&N Dec. 208, 221-23 (BIA 2014). In so doing, the applicant must establish that the group in which he is claiming membership is: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 237 (BIA 2014). A common immutable characteristic is one that is so fundamental to the identity or conscience of each group member that it cannot or should not be changed; it can be an innate characteristic, such as sex or family relation, or a shared past experience. *See Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985). Particularity requires the group to be "discrete and have definable boundaries" rather than being "amorphous, overbroad, diffuse, or subjective." *W-G-R-*, 26 I&N Dec. at 214. Social distinction requires the group to be "perceived as a group by society." *M-E-V-G-*, 26 I&N Dec. at 240. Once the applicant has established the existence of a cognizable particular social group, the applicant must demonstrate that he is a member of the delineated group. *See W-G-R-*, 26 I&N Dec. at 221-23.

In the present case, the Court has previously found the respondents have met their burden to establish past persecution on two different protected grounds, religion and political opinion. As such, the Court will not address whether they have also met their burden to establish past persecution on account of their membership in a particular social group as well.

### 3. Unable or Unwilling to Control

To qualify as past persecution, the source of past harm must be the government, a quasi-official group, or persons or groups that the government is unwilling or unable to control. *Avetovo-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000).

The respondents in the present case testified and explained to the satisfaction of the Court that members of a Shiite armed militia group, members of the Iraqi police force and other officers of the government were those who inflicted harm of the respondents and their family. The militia group was responsible the threatening letter which gave the family seventy two hours to relocate from their neighborhood. When they family was unable to in fact move within that time frame, their eldest son was kidnapped and murdered.

Respondent Faqar was detained and beaten by men in military uniforms stationed at a government checkpoint. Therefore, in both instances, the respondents' persecutors were officials from the government itself.

AL-GEBORI, et al.
A208-465-412

Country conditions evidence further corroborates the persecutors' affiliation with the government or forces the government is unable or unwilling to control. Specifically, the Iraq 2020 Human Rights Report states:

> Iraq's regular armed forces and domestic law enforcement bodies struggled to maintain order within the country, operating in parallel with the Popular Mobilization Committee, a state-sponsored umbrella military organization composed of approximately 60 militia groups, also known as Popular Mobilization Forces; such units operated throughout the country, often outside government control and in opposition to government policies. Most Popular Mobilization unit members were Shia Arabs, reflecting the demographics of the country. Ex. 12A, Tab A22.

The Court finds that the respondents' testimony and country conditions submissions convincingly establish that the persons who threatened the respondents and harmed them are either the Iraqi government, a quasi-official group, or persons or groups whom the government is either unwilling or unable to control.

Therefore, the Court finds Respondents suffered persecution by the Iraqi government or forces that the Iraqi government is unable or unwilling to control. *See Matter of Kasinga*, 21 I&N Dec. 357, 365 (BIA 1996).

Because respondents have sufficiently established that they suffered harm rising to the level of past persecution, on account of their actual or imputed political opinion and/or religion, and by perpetrators the government is unable or unwilling to control, they have established past persecution.

## 4. Well-Founded Fear of Future Persecution

Having established that they suffered past persecution, the respondents are entitled to a presumption that they possesses a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). DHS may overcome this presumption only by showing by a preponderance of the evidence that either: (1) there has been a fundamental change in circumstances, such that the respondents no longer have a well-founded fear of persecution; or (2) the respondents could avoid future persecution by internally relocating within the home country and that, under the circumstances, it would be reasonable to expect them to do so. 8 C.F.R. § 1208.13(b)(1)(i).

There is no such showing here. The respondents' testimony and country conditions submissions convincingly establish that the persons who threatened and harmed the respondents, in each instance, are either Iraqi government agents, a quasi-official group, or persons or groups whom the government is either unwilling or unable to control. There is no evidence that establishes that this affiliation and connection between the respondents' persecutors and the government has in fact changed. On the contrary, as stated above, the country conditions evidence indicate that the Iraqi government works in parallel with the Popular Mobilization Committee, a state-sponsored umbrella military organization composed of approximately 60 militia groups. These groups operate often outside of the control of the government. Thus, there has not been a

16

**AL-GEBORI, et al.**
A208-465-412

fundamental change in circumstances such that the respondents need no longer fear being a target on account of their actual or imputed political opinion and/or religion.

Similarly, there is no evidence in the record to show that the respondents could escape persecution by relocating elsewhere in Iraq, particularly given the fact that the government itself has persecuted them. The respondents have credibly testified to several attempts to relocate within Iraq. Such efforts have been in vain. The respondents and their family members have been persecuted at each new location.

Therefore, the Court finds that the respondents have established a well-founded fear of persecution in Iraq on account of their religion and political opinion.

### V. OTHER REQUESTED RELIEF

As the Court finds that all Respondents are eligible for relief in the form of asylum under Section 208 of the Act, it declines to analyze their respective eligibilities for withholding of removal under Section 241(b)(3) of the Act, and protection under the CAT given that a grant of asylum is the greater benefit. *See* 8 C.F.R. § 1208.16.

Accordingly, after careful consideration, the following orders are hereby entered:

### ORDERS

**IT IS HEREBY ORDERED** that all four Respondents (A208-465-412, A208-465-413, A208-465-414 and A208-465-415) applications for asylum pursuant to Section 208 of the Act are **GRANTED**;

**IT IS FURTHER ORDERED** that all four Respondents' applications for withholding of removal under Section 241(b)(3) of the Act and withholding of removal under the Convention Against Torture are **MOOT**.

Feb. 17, 2022
**Date**

_____
**MELISSA B. KARLEN**
**United States Immigration Judge**

**APPEAL RIGHTS:** Both parties have the right to appeal this decision. A notice of appeal must be filed with the Board of Immigration Appeals within thirty (30) days of the issuance of this decision. 8 C.F.R. § 1003.38(b). If the deadline for filing occurs on a Saturday, Sunday, or legal holiday, the time for filing will be extended to the next business day. *Id.* If the deadline expires and no appeal has been filed, this decision becomes final. 8 C.F.R. § 1003.38(d).

**CERTIFICATE OF SERVICE**
**SERVICE BY:**          Mail (M)          Personal Service (P)

17

AL-GEBORI, et al.
A208-465-412

TO: _____ DHS    [ ] Alien    [✓] Alien's Attorney
DATE: __2/17/22__    By: _____    (Court Staff)

18

# EXHIBIT B

Department of Homeland Security
U.S. Citizenship and Immigration Service

**F rm I-797C, Notice of Action**

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | March 03, 2023 |
| **CASE TYPE** | **USCIS ALIEN NUMBER** |
| I-485, Application to Register Permanent Residence or Adjust Status | A208465415 |
| **RECEIPT NUMBER** | **RECEIVED DATE** | **PAGE** |
| MSC2390314659 | February 28, 2023 | 1 of 1 |
| **PRIORITY DATE** | **PREFERENCE CLASSIFICATION** | **DATE OF BIRTH** |
| | Asylum status | February 01, 1997 |

**PAYMENT INFORMATION:**

HAYA ABDULKADHIM
C/O AKRAM ABUSHARAR
501 N BROOKHURST ST STE 202        3  00001022
ANAHEIM, CA  92801

|||
|---|---|
| Application/Petition Fee: | $1,140.00 |
| Biometrics Fee: | $85.00 |
| Total Amount Received: | $1,225.00 |
| Total Balance Due: | $0.00 |

NAME AND MAILING ADDRESS

We have received your form and are currently processing the above case. If this notice contains a priority date, this priority does not reflect earlier retained priority dates. We will notify you separately about any other case you filed.

If we determine you must submit biometrics, we will mail you a biometrics appointment notice with the time and place of your appointment.

If you have questions or need to update your personal information listed above, please visit the USCIS Contact Center webpage at uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

| **USCIS Office Address:** | **USCIS Contact Center Number:** |
|---|---|
| USCIS | 1-800-375-5283 |
| National Benefits Center | ATTORNEY COPY |
| Attention: I-485 Refugee/Asylum | |
| 7600B West 119th Street | |
| Overland Park, KS 66213 | |



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C  10/13/21

Department of Homeland Security
U.S. Citizenship and Immigration Servic

Form I-797C, Notice of Action

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | March 03, 2023 |
| **CASE TYPE** | **USCIS ALIEN NUMBER** |
| I-485, Application to Register Permanent Residence or Adjust Status | A208465412 |
| **RECEIPT NUMBER** | **RECEIVED DATE** | **PAGE** |
| MSC2390314660 | February 28, 2023 | 1 of 1 |
| **PRIORITY DATE** | **PREFERENCE CLASSIFICATION** | **DATE OF BIRTH** |
| | Asylum status | June 17, 1971 |

PAYMENT INFORMATION:

HIKMA AL GEBORI
C/O AKRAM ABUSHARAR
501 N BROOKHURST ST STE 202     3   00001023
ANAHEIM, CA  92801

| | |
|---|---|
| Application/Petition Fee: | $1,140.00 |
| Biometrics Fee: | $85.00 |
| Total Amount Received: | $1,225.00 |
| Total Balance Due: | $0.00 |

NAME AND MAILING ADDRESS

We have received your form and are currently processing the above case. If this notice contains a priority date, this priority does not reflect earlier retained priority dates. We will notify you separately about any other case you filed.

If we determine you must submit biometrics, we will mail you a biometrics appointment notice with the time and place of your appointment.

If you have questions or need to update your personal information listed above, please visit the USCIS Contact Center webpage at uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

**USCIS Office Address:**

USCIS
National Benefits Center
Attention: I-485 Refugee/Asylum
7600B West 119th Street
Overland Park, KS 66213

**USCIS Contact Center Number:**

1-800-375-5283
ATTORNEY COPY





20

**Department of Homeland Security**
U.S. Citizenship and Immigration Servic

**I rm I-797C, Notice of Action**

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | March 03, 2023 |

| CASE TYPE | USCIS ALIEN NUMBER |
|---|---|
| I-485, Application to Register Permanent Residence or Adjust Status | A208465413 |

| RECEIPT NUMBER | RECEIVED DATE | PAGE |
|---|---|---|
| MSC2390314662 | February 28, 2023 | 1 of 1 |

| PRIORITY DATE | PREFERENCE CLASSIFICATION | DATE OF BIRTH |
|---|---|---|
| | Asylum status | June 01, 2000 |

SAIF AL GBURI
C/O AKRAM ABUSHARAR
501 N BROOKHURST ST STE 202
ANAHEIM, CA 92801

3  00001025

**NAME AND MAILING ADDRESS**

**PAYMENT INFORMATION:**

| | |
|---|---|
| Application/Petition Fee: | $1,140.00 |
| Biometrics Fee: | $85.00 |
| Total Amount Received: | $1,225.00 |
| Total Balance Due: | $0.00 |

We have received your form and are currently processing the above case. If this notice contains a priority date, this priority does not reflect earlier retained priority dates. We will notify you separately about any other case you filed.

If we determine you must submit biometrics, we will mail you a biometrics appointment notice with the time and place of your appointment.

If you have questions or need to update your personal information listed above, please visit the USCIS Contact Center webpage at uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

**USCIS Office Address:**

USCIS
National Benefits Center
Attention: I-485 Refugee/Asylum
7600B West 119th Street
Overland Park, KS 66213

**USCIS Contact Center Number:**

1-800-375-5283
ATTORNEY COPY





Department of Homeland Security
U.S. Citizenship and Immigration Servic

l   m I-797C, Notice of Action

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | March 03, 2023 |

| CASE TYPE | USCIS ALIEN NUMBER |
|---|---|
| I-485, Application to Register Permanent Residence or Adjust Status | A208465414 |

| RECEIPT NUMBER | RECEIVED DATE | PAGE |
|---|---|---|
| MSC2390314661 | February 28, 2023 | 1 of 1 |

| PRIORITY DATE | PREFERENCE CLASSIFICATION | DATE OF BIRTH |
|---|---|---|
| | Asylum status | July 23, 1996 |

FAQAR AL GBURI
C/O AKRAM ABUSHARAR      3   00001024
501 N BROOKHURST ST STE 202
ANAHEIM, CA  92801

**PAYMENT INFORMATION:**

| | |
|---|---|
| Application/Petition Fee: | $1,140.00 |
| Biometrics Fee: | $85.00 |
| Total Amount Received: | $1,225.00 |
| Total Balance Due: | $0.00 |

NAME AND MAILING ADDRESS

We have received your form and are currently processing the above case. If this notice contains a priority date, this priority date does not reflect earlier retained priority dates. We will notify you separately about any other case you filed.

If we determine you must submit biometrics, we will mail you a biometrics appointment notice with the time and place of your appointment.

If you have questions or need to update your personal information listed above, please visit the USCIS Contact Center webpage at uscis.gov/contactcenter to connect with a live USCIS representative in English or Spanish.

**USCIS Office Address:**

USCIS
National Benefits Center
Attention: I-485 Refugee/Asylum
7600B West 119th Street
Overland Park, KS 66213

**USCIS Contact Center Number:**

1-800-375-5283
ATTORNEY COPY



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.    Form I-797C  10/13/21

# EXHIBIT C

<u>Para tener acceso a este sitio en español, presione aquí (./es)</u>

# Check Case Processing Times

## Select your form, form category, and the office that is processing your case

*Refer to your receipt notice to find your form, category, and office. For more information about case processing times and reading your receipt notice, visit the <u>More Information About Case Processing Times (./more-info)</u> page.*

**Form \***

I-485 | Application to Register Permanent Residence or Adjust Status ⌄

**Form Category \***

Based on grant of asylum more than 1 year ago ⌄

**Field Office or Service Center \***

All Field Offices ⌄

**Get processing time**

## Processing time for Application to Register Permanent Residence or Adjust Status (I-485) at All Field Offices

| 80% of cases are completed within |
|---|
| **15.5** Months |

<u>Check your case status (https://egov.uscis.gov/casestatus/landing.do)</u> to track the status of an immigration application, petition, or request.

ℹ **Notes**

23